**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Joe Patterson, <br><br> Plaintiff, <br><br> vs. <br><br> We Are Sharing Hope SC and United Network for Organ Sharing, <br><br> Defendants. | C.A. No. 2:20-mc-00471 <br><br><br> **NOTICE OF INTENT TO FILE SUIT** |

PLEASE TAKE NOTICE that the Plaintiff in the above-captioned matter, pursuant to South Carolina Code § 15-79-125, intends to file suit against the above-named Defendants. The parties must participate in a mediation conference within one hundred twenty (120) days of service of this Notice of Intent to File Suit.

## THE PARTIES

1. The plaintiff is Joe Patterson ("Mr. Patterson"). Mr. Patterson is a citizen and resident of Tennessee.

2. Defendant We Are Sharing Hope SC ("Sharing Hope") is an organ and tissue recovery service provider located and operating in Charleston, South Carolina.

3. Sharing Hope is the designated organ procurement organization ("OPO") for organ recovery services in most of South Carolina, and it provides organ and tissue donor services to numerous hospitals throughout South Carolina.

4. Sharing Hope holds itself out to the public as a competent and qualified OPO.

5. Sharing Hope has a duty to provide competent and qualified services in the procurement, testing, evaluation, reporting, and distribution of organs for donation.

1

6.      Defendant United Network for Organ Sharing ("UNOS") is an organization with headquarters in Richmond, Virginia that manages and serves as the one and only organ transplant system in the United States, which is known as the Organ Procurement and Transplantation Network ("OPTN"), under a contract with the federal government.

7.      According to UNOS's website, its responsibilities include, but are not limited to, "managing the national transplant waiting list," "matching donors to recipients," "maintaining the database that contains all organ transplant data for every transplant event that occurs in the U.S.," and "monitoring every organ match to ensure organ allocation policies are followed." https://unos.org/about/, last accessed October 1, 2020.

8.      UNOS advertises that it "provides a vital link in the organ transplant process" because "[i]ts policies and computerized network match donated organs with transplant candidates in ways that save as many lives as possible and provide transplant recipients with the best possible chance of long-term survival." https://unos.org/transplant/how-we-match-organs/, last accessed October 1, 2020.  In fact, according to UNOS, "[e]very lifesaving organ transplant is managed through UNOS' computer system, which matches donors with potential transplant recipients 24 hours a day, 365 days a year." https://unos.org/about/, last accessed October 1, 2020.

9.      UNOS holds itself out to the public as a competent and qualified manager of the only organ transplant system in the United States and provider of services related to the organ transplant and donation system and process in the United States.

10.     UNOS has a duty to provide competent and qualified services in connection with its management of the country's only organ transplant system and its provision of services for the organ transplant and donation system and process in the United States.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the case is between citizens of different states.

12.     The Court has personal jurisdiction over Sharing Hope because Sharing Hope is located in South Carolina.

13.     The Court has personal jurisdiction over UNOS because UNOS manages and serves as the one and only organ transplant system in the United States.  As the OPTN for the United States, UNOS manages every organ transplant and monitors every organ match in the United States, including those involving South Carolina donors and recipients, and matches organ donors and recipients, including those who are located in South Carolina.

14.     Venue is proper in this district because Defendant We Are Sharing Hope SC is located in this district, and a substantial part of the events giving rise to this action occurred in this district.

## STATEMENT OF THE FACTS

15.     Mr. Patterson's physicians at Vanderbilt University Medical Center ("Vanderbilt") determined that he was in need of a liver transplant.  Mr. Patterson's physicians further determined that he was a suitable candidate for a liver transplant, and he was placed on the transplant list.

16.     Mr. Patterson's physicians at Vanderbilt were offered a liver from the donor associated with donor identification numbers AFKY198, 2018-0516, and 18-15828 (the "Donor").

17.     Mr. Patterson's physicians at Vanderbilt accepted the Donor's liver for Mr. Patterson.  Mr. Patterson underwent a liver transplant with the Donor's liver on November 27, 2018.

18.     Sharing Hope was the OPO that procured and distributed the Donor's organs, including the liver that was transplanted into Mr. Patterson.  Sharing Hope labeled the Donor as having Type O blood.

19.     Upon information and belief, Sharing Hope, as the OPO for the Donor's liver, ordered pre-transplant testing of the liver, evaluated the suitability of the liver for transplant, reported the liver as available for transplant to UNOS, and distributed the liver for transplant.

20.     Upon information and belief, UNOS reported the Donor's liver as available for transplant, listed the Donor as having type O blood, and matched Mr. Patterson with the Donor's liver.

21.     Mr. Patterson began suffering serious complications soon after his liver transplant surgery, including, but not limited to, low hemoglobin levels, markedly elevated liver function tests, and acute renal failure.

22.     Mr. Patterson had type O blood.  It was determined shortly after his liver transplant that the Donor whose liver Mr. Patterson received had type A blood.  Type A blood is incompatible with type O blood.  Therefore, Mr. Patterson received an ABO incompatible donor liver.

23.     Mr. Patterson's physicians initiated immunosuppression therapies in an attempt to make Mr. Patterson's body accept the ABO incompatible liver he received, but Mr. Patterson remained critically ill and continued to suffer serious complications, including, but not limited to, acute renal failure, markedly elevated liver function tests, heart problems, hypotension, and respiratory failure.

24.     After several months of immunosuppression therapies, Mr. Patterson's condition continued to deteriorate, and he suffered acute organ rejection.  His physicians at Vanderbilt determined that he was in need of a second liver transplant due to acute rejection of the Donor's

ABO incompatible liver.

25.     Mr. Patterson was placed on the transplant list again, and he underwent a second liver transplant at Vanderbilt with an ABO compatible liver on March 19, 2019.

26.     According to Mr. Patterson's medical records, the undisputed cause of his second liver transplant was acute rejection of his first liver transplant due to ABO incompatibility.

27.     By the time Mr. Patterson's second liver transplant was completed, his overall condition had deteriorated substantially due to the ABO incompatible liver he received.

28.     Mr. Patterson suffered and continues to suffer serious complications following his second liver transplant, including, but not limited to, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.

29.     According to UNOS policies, Sharing Hope, as the OPO for the Donor's liver, was responsible for determining the Donor's blood type by testing at least two blood samples from the Donor drawn on separate occasions, having different collection times, and submitted as separate samples.  The two blood samples from the Donor were required to be collected before the Donor received emergency blood transfusions and to have results indicating the same blood type.

30.     Sharing Hope ordered pre-transplant blood testing for the Donor whose liver Mr. Patterson received from VRL Eurofins ("VRL").  VRL issued two final pre-transplant testing reports for the Donor to Sharing Hope.  Both reports showed the Donor's blood type was indeterminate and that the samples used for the ABO blood typing were drawn after the Donor received emergency blood transfusions.

31.     Upon information and belief, Sharing Hope failed to determine the Donor's blood

5

type with two reliable Donor blood samples collected before the Donor received emergency blood transfusions.

32.     Sharing Hope should not have reported the Donor's liver as available for transplant and should not have distributed the Donor's liver for transplant given the VRL test results indicating that the Donor's blood type could not be determined and given the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions.

33.     As a result of Sharing Hope's wrongful reporting of the availability of and distribution of the Donor's liver for transplant, and wrongful labeling of the Donor as having type O blood, Mr. Patterson received a transplanted liver of an incompatible blood type, which resulted in acute rejection of the ABO incompatible liver and caused Mr. Patterson to suffer numerous injuries and to have to undergo a second liver transplant.

34.     UNOS should not have reported the Donor's liver as available for transplant, should not have reported the Donor as having type O blood, and should not have matched Mr. Patterson with the Donor's liver given the VRL test results indicating that the Donor's blood type could not be determined and given the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type.

35.     As a result of UNOS's wrongful reporting of the Donor's liver as available for transplant and wrongful matching of Mr. Patterson with the Donor's liver, Mr. Patterson received a transplanted liver of an incompatible blood type, which resulted in serious and ongoing injuries and which required Mr. Patterson to undergo a second liver transplant.

36.     The negligence, gross negligence, and reckless disregard for the health, wellbeing,

6

and rights of Mr. Patterson by Sharing Hope and UNOS (collectively "Defendants") caused Mr. Patterson to have to endure a second liver transplant and to suffer numerous severe injuries, many of which continue to this day.

37.     Defendants, directly and vicariously through their agents, servants, contractors, and employees, failed to provide the requisite and adequate standard of care to Mr. Patterson and were negligent, reckless, willful, wanton, and grossly negligent as described in further detail in this Notice.

38.     Attached to this Notice of Intent to Sue is the affidavit of Alexander Duncan, M.B., Ch.B.  Dr. Duncan is a licensed physician and is board certified in transfusion medicine and clinical pathology.

39.     As Dr. Duncan testifies in his affidavit, Sharing Hope deviated from the recognized and generally accepted standards of care in connection with its reporting the availability of and distributing the Donor's liver for transplant in the following separate and distinct ways:

    a.  By wrongfully reporting the availability of the Donor's liver for transplant despite the receipt of pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

    b.  By wrongfully reporting the availability of the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

    c.  By wrongfully reporting the Donor as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was

indeterminate and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions;

d. By distributing the Donor's liver for transplant despite the receipt of pre-transplant laboratory testing results from VRL reporting that the ABO blood type for the Donor was indeterminate and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

e. By distributing the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type; and

f. By failing to recognize or ignoring that the samples used to perform ABO blood typing for the Donor were collected after the Donor received emergency blood transfusions, which made the Donor's ABO blood typing unreliable, as manifest by the indeterminate ABO blood typing reported by VRL.

40. As Dr. Duncan testifies in his affidavit, UNOS deviated from the recognized and generally accepted standards of care in connection with its reporting the availability of the Donor's liver for transplant and matching of Mr. Patterson with the Donor's liver in the following separate and distinct ways:

a. By wrongfully reporting the Donor's liver as available for transplant despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

8

b. By wrongfully reporting the availability of the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

c. By failing to recognize or ignoring that the samples used to perform ABO blood typing for the Donor were collected after the Donor received emergency blood transfusions, which made the Donor's ABO blood typing unreliable, as manifest by the indeterminate ABO blood typing reported by VRL;

d. By wrongfully labeling the Donor as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type; and

e. By wrongfully matching Mr. Patterson with the Donor's liver despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type.

41.    Defendants' deviations from the standards of care outlined above proximately caused Mr. Patterson to undergo a second liver transplant and to numerous suffer serious and life-threatening injuries, including, but not limited to, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled

diabetes resulting from the use of prescribed steroids, blood clots, and sepsis. Many of these injuries are ongoing.

42. As a direct and proximate result of Defendants' failure to follow the recognized and generally accepted standards of care, Mr. Patterson underwent a second liver transplant and suffered, and continues to suffer, serious complications, including, but not limited to, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.

43. Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of Defendants' negligence, gross negligence, and reckless disregard for his health, wellbeing, and rights. Such damages include, but are not limited to, Mr. Patterson's past medical costs, anticipated future medical costs and medical monitoring, lost income, emotional distress, pain and suffering, and loss of enjoyment of life.

44. If Mr. Patterson had received a donor liver of a compatible blood type, he most likely would have successfully recovered from his first liver transplant, would not have required a second liver transplant, and would not have suffered the serious and ongoing injuries outlined above.

45. Therefore, Mr. Patterson is entitled to judgment for full all direct, consequential, punitive, and special damages against Defendants in an amount to be determined by a jury, unless the parties can reach a resolution through mediation.

**AFFIDAVIT OF ALEXANDER DUNCAN, M.B., Ch.B.**

The affidavit of expert Alexander Duncan, M.B., Ch.B., specifying the negligent acts and omissions of Defendants and the factual basis for each, based upon the available evidence at this time, is attached pursuant to S.C. Code § 15-36-100.

**ANSWERS TO STANDARD INTERROGATORIES**

1.     Give the names and addresses of persons known to the parties or counsel to be witnesses concerning the facts of the case and indicate whether or not written or recorded statements have been taken from the witnesses and indicate who has possession of such statements.

**RESPONSE:**

a.  Joe Patterson

   Mr. Patterson must be contacted through the undersigned attorneys.

b.  The staff and employees of Defendant We Are Sharing Hope SC.

c.  The staff and employees of Defendant United Network for Organ Sharing.

d.  The staff and employees of Vanderbilt University Medical Center in Nashville, Tennessee who have treated and cared for Mr. Patterson since November 21, 2018.

e.  Dr. Thomas Sulkowski
   Sulkowski Family Medicine
   1810 Ward Drive, Suite 101
   Murfreesboro, TN

f.  The staff and employees of Saint Thomas Rutherford Hospital in Murfreesboro, Tennessee who have cared for Mr. Patterson since November 20, 2018.

g.  The staff and employees of Grand Strand Medical Center who cared for the Donor.

h.  Alexander Duncan, M.B., Ch.B.
   Emory University Hospital
   Clinical Laboratories, Room F145
   1364 Clifton Road, N.E.
   Atlanta, GA 30322

Plaintiff is not in possession of any non-privileged written or recorded statements taken from any witnesses for purposes of this litigation other than the attached expert affidavit of Dr. Alexander Duncan. Plaintiff expressly reserves the right to supplement this response, as well as all other responses.

2. Set forth a list of photographs, plats, sketches or other prepared documents in possession of the parties that relate to the claim or defense in the case.

**Response:** Mr. Patterson's medical records from Sulkowski Family Medicine, Vanderbilt University Medical Center, and St. Thomas Rutherford Hospital; Records from VRL Eurofins relating to the Donor; Records from Grand Strand Medical Center relating to the Donor; Records from UNOS relating to the Donor; Records from Vanderbilt University Medical Center relating to the Donor; Records from Medical University of South Carolina relating to the Donor and to Allen Holliman. For further information regarding these records, see Exhibit A to Dr. Duncan's affidavit.

3. In cases involving personal injury, set forth the names and addresses of all physicians who have treated the party and all hospitals to which the party has been committed in connection with said injuries and also set forth a statement of all medical costs involved.

**Response:** Mr. Patterson has been treated by physicians at Sulkowski Family Medicine, St. Thomas Rutherford Hospital, and Vanderbilt University Medical Center in connection with his liver transplants and injuries described in this Notice. Further information regarding specific physicians who have cared for Mr. Patterson can be found in his medical records referenced above. Mr. Patterson continues to incur medical costs as a result of the events described in this Notice, so the full extent of the medical costs involved is not yet known. So far, Mr. Patterson has incurred millions of dollars in medical costs.

12

4.      Set forth the names and addresses of all insurance companies which have liability insurance coverage relating to the claim and set forth the number or numbers of the policies involved and the amount or amounts of liability coverage provided in each policy.

**Response:**  Unknown by Plaintiff at this time.

5.      Set forth an itemized statement of all damages, exclusive of pain and suffering, claimed to have been sustained by the party.

**Response:**  In addition to Mr. Patterson's pain and suffering, Mr. Patterson has sustained damages for past medical costs, anticipated future medical costs and medical monitoring, lost income, emotional distress, loss of enjoyment of life, and other such damages as will be supplemented during discovery as further damages are identified and quantified.

6.      List the names and addresses of any expert witnesses whom the party proposes to use as a witness at the trial of the case.

**Response:**

Alexander Duncan,
Emory University Hospital
Clinical Laboratories, Room F145
1364 Clifton Road, N.E.
Atlanta, GA 30322

Plaintiff expressly reserves the right to supplement this response.

7.      For each person known to the parties or counsel to be a witness concerning the facts of the case, set forth either a summary sufficient to inform the other party of the important facts known to or observed by such witness, or provide a copy of any written or recorded statements taken from such witness.

**Response:**  Mr. Patterson has knowledge and information regarding his claims and damages in this matter and the suffering he has endured as a result of Defendants' negligence and

gross negligence. The staff and employees of Sharing Hope are expected to have information regarding the testing, evaluation, reporting the availability of, and distribution of the donor liver that Mr. Patterson received. It is expected that the staff and employees of UNOS have knowledge regarding the reporting of the availability of the Donor's liver for transplant and the matching of the Donor's liver with Mr. Patterson. It is expected that Dr. Thomas Sulkowski has knowledge regarding Mr. Patterson's injuries and health condition prior to his ABO incompatible liver transplant. It is anticipated that the staff and employees of St. Thomas Rutherford Hospital have knowledge regarding the events leading up to Mr. Patterson's first liver transplant. It is expected that the staff and employees of Vanderbilt University Medical Center have knowledge regarding both of Mr. Patterson's liver transplants, his injuries and required care resulting from his ABO incompatible transplant, and his expected prognosis. It is expected that the staff and employees of Grand Strand Medical Center who cared for the Donor have knowledge regarding the Donor's treatment and care preceding her death and the procurement of the Donor's organs. Dr. Duncan has knowledge regarding the opinions in his attached affidavit and is expected to respond to any defenses asserted by Defendants.

Respectfully submitted,

 s/John C. Moylan, III
John C. Moylan, III (D.S.C. Id. No. 5431)
Lucy Dinkins (D.S.C. Id. No. 11961)
WYCHE, P.A.
807 Gervais St., Suite 301
Columbia, South Carolina  29201
Telephone: (803) 254-6542
Facsimile:  (803) 254-6544
Email:  jmoylan@wyche.com
              ldinkins@wyche.com

October 22, 2020                                    *Attorneys for Plaintiff*

14